30965. PROGRESSIVE LIFE INS. CO. *v.* ARCHER.

DECIDED MARCH 15, 1946. REHEARING DENIED MARCH 29, 1946.

*Boykin & Boykin,* for plaintiff in error. *J. L. Smith,* contra.

MACINTYRE, J. In the city court of Carrollton, December term, 1944, Mrs. Evie B. Archer, the beneficiary under a life-insurance policy, issued by the Progressive Life Insurance Company, insuring the life of James Harold Archer in the amount of $2500 under an accidental supplementary contract attached to and forming a part thereof, brought suit against that company on said policy. James Harold Archer, the insured, met his death while driving and operating an automobile on U. S. Highway No. 27, in Carroll County on July 29, 1944. The contract attached to said policy was what is known as a supplemental contract with "double indemnity for accidental death." In said supplemental contract, made a part of said policy No. 0-2318, at and for the consideration of $3.75 as additional premium, "The company agrees . . provided, however, that no accidental death benefit will be paid if the death of the insured is the result of suicide, whether sane or insane, nor if the death is caused or contributed to, directly or indirectly, or wholly or partially, by disease, or bodily or mental infirmity, nor if death results from bodily injuries sustained while participating in aviation or aeronautics, or from the taking of poison or the inhaling of gas, either voluntarily or accidentally, or while the insured is in military or naval service in the time of war, or while under the influence of narcotics or intoxicating liquor, or while engaged in or committing any unlawful act or deed." It was admitted: that the $2500 death claim was promptly

paid by the insurer, Progressive Life Insurance Company, plaintiff in error; that the insurer refused to recognize the claim under the double-indemnity clause of the contract of $2500, for the reason that the company claimed a violation of the terms and conditions of the policy, in that the insured was, at the time of his death, in specific violation of the terms and conditions of the contract, to wit: "That he was driving and operating said automobile while under the influence of narcotics or intoxicating liquors; also while engaged in or committing an unlawful act or deed in that he was exceeding the speed limit in the operation of his automobile as permitted by the laws of this State." There was a verdict for the plaintiff. The insurer made a motion for a new trial, which was overruled, and it excepted.

1. Relative to special grounds 1 and 2, the plaintiff in error states in its brief: "In each ground it is insisted that the court erred in permitting the plaintiff, Mrs. Evie B. Archer [mother], also the father, F. M. Archer, of insured, James Harold Archer, each to testify when they first saw him after the accident—and— did you know where the accident occurred? We objected to this testimony on the ground it was conclusion of the witnesses." It is obvious from the record that the father and mother of the deceased were put upon the stand for the purpose of proving the death of their son. Neither was present at the occurrence, nor undertook to say what activity caused his death. Though the word "occurrence" would have been a more appropriate word to have used under the circumstances, from the context of the evidence the word "accident" was used by the witness as synonomous with the word "occurrence" and not in its technical sense, and was so understood by the jury. Such use of the word "accident" was not such harmful error as to mislead the jury. "In its [the word 'accident'] ordinary meaning it does not [imply or] negative the idea of negligence on the part of the person whose act brought about the event." Beaumont S. L. & W. R. Co. v. Schmidt, 123 Texas 580 (72 S. W. 2d, 899); Savannah Electric Co. v. Jackson, 132 Ga. 559 (64 S. E. 680); Alabama Great Southern R. Co. v. Brown, 138 Ga. 328, 332 (6) (75 S. E. 330).

2. As to special grounds 3 and 8—the witness Spruell testified that he and the deceased, Archer, drank the same amount of beer, and that the beer did not have any effect on him (Spruell). The

defendent objected to this testimony and moved for a mistrial. On the failure of the judge to grant a mistrial the defendant assigns error. Regarding the defendant's motion for a mistrial and objection, the judge made the following statement: "I will exclude the testimony, but gentlemen of the jury, you will consider the case only with reference to the insured, Harold Archer. What someone else might have done would have no bearing on your consideration of the case. I overrule the motion." Where the court thus expressed its disapproval and immediately applied the corrective measure above, indicated, no reversible error was committed, as contended in special ground 3.

Special ground 8 states that: "The following material evidence was illegally admitted by the court to the jury, over the objection of the movant, to wit: The witness, Stanley Spruell, for plaintiff in this case, was permitted to testify over objection of movant: 'Q. Did that beer that evening have any effect on you? A. No sir.' Mr. Smith: 'He [Mr. Boykin, movant's counsel] went into [the matter that the deceased and the witness were riding together at the time of the occurrence, and had shortly theretofore drunk two bottles each of the same kind of beer] Mr. Boykin asked him [a] while ago, was the beer affecting him.' Movant objected to the evidence as soon as and at the time it was offered, and then and there urged before the court the following grounds of objection: movant moved to exclude said testimony, same being highly prejudicial, irrelevant, and immaterial in said case, which objection the court then and there overruled and admitted said testimony." No reversible error was committed as contended in this ground.

3. As to special ground 4—the witness Spruell, sworn for the plaintiff, testified on cross-examination in part: "I don't think he [Archer] was running 75 miles an hour. If I made the statement that night to patrolman Taylor and patrolman Lowry that he was running 75 miles an hour, I don't remember what I told them. I don't remember if I made a statement to officers Taylor and Lowry that Mr. Archer was running 75 miles per hour; between 50 and 55, that's my estimation. . . Yes, I made the statement to these gentlemen that you just named, Taylor and Lowry, that this car, at the time this happened, was being operated at approximately 75 miles an hour." On redirect examination, he testified in part: "I believe I said in my opinion it

wasn't running over 55 miles an hour at the time the wreck occurred." On recross-examination he testified in part: "I told the State patrolmen immediately after the accident happened that he was running 75 miles an hour, I just stated that; I was so excited I don't know what I told them. I told them, but I wasn't right then." The patrolman, Taylor, testified, after Spruell had been questioned, in part: "I did come to the clinic and interview Mr. Stanley Spruell. The statement made in my presence by Stanley Spruell after we got to the clinic was as follows: I went in the doctor's office and asked him if it would be all right for me to question him and he said 'Yes;' and I asked him, 'Stanley, about how fast was you traveling when the car turned over?' He said they were going between 75 and 80 miles an hour, he says, 'because I had just looked at the speedometer, and we would have probably been going faster, but the motor had just been overhauled and that was about as fast as the motor would go.'" The defendant contends that this part of the testimony of Taylor was a part of the res gestæ, and as such should have been allowed to remain in for all purposes, and that the judge erred in allowing the testimony for impeachment purposes only. The objection was not to the testimony of Spruell while on the witness stand, as to whether his testimony showed a statement by him that was a part of the res gestæ, but the objection in ground 4 was to the restricting of such testimony of Taylor solely for the purpose of impeaching Spruell; such statement having contradicted a statement made by Spruell. The statement of Taylor, in question, according to him was made, not at the scene of the wreck, but at a clinic and it did not appear how long after the occurrence this statement of Spruell was made to Taylor. Hence the testimony of Taylor in question as to what Spruell said at the clinic was admissible only, as contradicting Spruell's statement, for the purpose of impeachment. This ground is not meritorious.

4. As to special ground 7—the witness Spruell testified on direct examination that Archer had been traveling between 50 and 55 miles per hour, and on cross-examination denied that he had told the patrolman, Taylor, that the automobile was traveling 70 or 75 miles per hour. Spruell, when he was reintroduced for the plaintiff, in explaining the testimony in the direct and cross-examination, testified as follows: "The time when I was talking

to Mr. Taylor, the patrolman, out here about 6:35, something like that. That was right after I was injured up there. I was skinned up all over. I wasn't bruised. I did receive a good deal of *shock* out there when I had this wreck. I do remember making the statement to them about the car running 80 miles an hour, but *I was excited then. I could have* said nearly anything about it then." The allowance of such testimony in explaining his former testimony was not reversible error. (Italics ours.)

5. As to special ground 9—the defendant contends that "there is no evidence whatsoever in the record to warrant, authorize, or justify the positive and negative evidence rule to be given in charge to the jury." "The existence of a fact testified to by one positive witness is to be believed, rather than that such fact did not exist because many witnesses who had the same opportunity of observation swear that they did not see or know of its having existed. This rule shall not apply when, two parties having equal facilities for seeing or hearing a thing, one swears that it occurred, the other that it did not." Code, § 38-111. In *Williams* v. *State,* 23 *Ga. App.* 542 (99 S. E. 43), it is stated: "It is positive testimony for a witness to say that a thing did or did not happen; it is negative testimony for a witness to say that if such a thing happened he did not see it or know of it." Miss Marian Moates testified in part: "On July 24, 1944, the day that a car turned over and Mr. Harold Archer was killed, I did see that automobile. At the time [of the wreck], I was standing in the kitchen, ironing, in front of two windows, and I saw it out of the window. . . The automobile turned over twice, and I went back in the house and put on a house coat and when I came out the Spruell boy was sitting on the side of the road." This was positive testimony as to how many times the car turned over, as a circumstance connected with the wreck in question. Spruell, a witness for the plaintiff, who was in the car with Archer at the time Archer was killed in the wreck, when asked how many times the car turned over, said: "How many times the car turned over, I wouldn't be for sure, I couldn't tell. I don't know, all I know is what they said, whether it turned over more than once. I was in the car. I didn't know nothing about it till I got up off the cement. I didn't know something about it, I don't know, I couldn't tell, not because the beer was working on me, that is not why I had forgot all about it.

I drank two bottles of beer. I tell this jury I can't tell how many times that car turned over. They said it did, I couldn't swear that it did. I don't know whether it did or not. When we crossed Buck Creek coming up that road, we were on the right-hand side of the road. I remember the car hitting the spillway. I remember turning to the left and running 180 feet,· remember turning to the left, yes, sir. The driver got it back in the road running toward Carrollton. When he turned it back I don't remember nothing else about it. He turned it back in the road, toward Carrollton, and then when he got in front of Mr. Dorsey Cole's house the car began to turn over and over. That's where I lost consciousness, when he first turned it, yes." This, it seems to us, was negative testimony as to whether or not the car turned over twice. *Neill* v. *State,* 79 *Ga.* 779, 781 (3) (4 S. E. 871); *Welborn* v. *State,* 116 *Ga.* 522 (42 S. E. 773); *Matthews* v. *Poythress,* 4 *Ga.* 287, 295 (2). We think that this testimony was sufficient to authorize the charge on positive and negative evidence, irrespective of whether there is any other positive and negative evidence in the record. The writer, speaking for himself alone, thinks that the following testimony of Mrs. Allen was negative testimony: "I saw it [the car in question] coming up the road there, I was standing there breaking up some toothbrushes when they started out of control. It didn't get up the hill, it began turning over. I watched the car when it hit the spillway on the right-hand side, then he turned his car back this way, toward Cole's house, and went across the road, it began turning. Well, it was so fast I don't know about that, I just know it commenced turning over. It turned over twice, I think." As interpreted by me, I think that the testimony of Mrs. Allen above quoted, as to how many times the car turned over, was not positive testimony that it turned over twice, but was to the effect merely that she did not know that it did. Where witnesses have equal facilities for seeing or hearing a thing and one witness swears that it occurred and the other that it did not, the latter's testimony, while contradictory, is as much positive as the former, and is not to be confused with negative testimony that the witness was present and did not see or hear or know it. Here the witness was present and, under my interpretation, the evidence, of the witness, that she did not know whether the car turned over twice, was merely negative testimony. *Heywood* v. *State,* 12 *Ga. App.* 643 (77

S. E. 1130). We think that it was not reversible error to charge: "The existence of a fact testified to by one positive witness is rather to be believed than that such fact did not exist because several witnesses who had the same opportunity of observation swear that they did not see or know of its having transpired. This does not apply to parties having equal facilities for seeing or hearing a thing, one swears that it occurred, the other that it did not. With reference to this question of positive and negative testimony, the jury, in weighing the testimony of such witnesses, will consider the evidence upon the question of their credibility." This ground does not disclose reversible error. See, in this connection, *Moore* v. *State,* 57 *Ga. App.* 287 (195 S. E. 320); *Southern Ry. Co.* v. *O'Bryan,* 115 *Ga.* 659 (42 S. E. 42).

6. As to special grounds 10, 11, and 12—the court charged the jury in part: "There was, however, attached to the policy a supplemental or additional contract, which is permitted legally under our laws, and that contract is all that you are considering, and where such contract provides (that if death results directly and independently of all other causes from bodily injuries affected solely through external, violent, and accidental means, and occurs within 90 days from the date of such accident, and if such injuries are evidenced by a visible contusion or wound on the exterior of the body, then the company will immediately pay as accidental death benefit a sum equal to the sum described in this policy as the face amount, in addition to the insurance under the policy, and that amount in this case is $2500. Provided, however, that no accidental death benefit will be paid for the death of the insured as a result of suicide, whether sane or insane, nor if death is caused or contributed to, directly or indirectly, wholly or partially, by disease or bodily or mental infirmity, nor if death results from bodily injuries sustained while participating in aviation, or aeronautics, or from the taking of poison or the inhaling of gas, either voluntarily or accidently, or while the insured is in the military or naval service in time of war, or while under the influence of narcotics or intoxicating liquor, or while engaged in committing any unlawful act or deed, or from injuries intentionally inflicted by another person or at the hands of justice.) The part of the charge in parentheses is taken verbatim from the provisions in the policy in question, except for a clause which dealt

with certain details in cases of drowning and was not pertinent to this case. The several exclusions contained therein are legal and permissible under the laws of the State of Georgia, and where it is shown to the satisfaction of the jury that death resulted from one of the causes excluded by the policy, even though the death may be accidental and result solely from bodily injuries effected solely through external violent and accidental means. The insurance company would not be liable if the injury occurred while the insured was engaged in activity excluded under the policy. A copy of the policy is attached to the plaintiff's petition. The original policy is in evidence, and you will have those documents out with you and you can read fully this double-indemnity part of the policy, if you so desire. I have simply read to you a part of the same that is pertinent to this charge. Now, gentlemen, I charge you that the burden is upon the plaintiff, Mrs. Archer, who is the beneficiary of this policy, to show by a preponderance of the evidence that the insured, James Harold Archer, met his death in a manner conforming to the double indemnity feature of the policy."

Thereafter, the judge charged that the insurance company would not be liable if the injury occurred while the deceased was engaged in the activity of driving an automobile while under the influence of intoxicating liquors, or in excess of 55 miles per hour, both of which are a violation of the law, and then specifically charged the jury when it was a violation of the law for the driver of an automobile to be under the influence of intoxicating liquors, and what is a violation of the law relative to excessive speed (over 55 miles per hour); and immediately following, the judge charged: "If the deceased, or the insured, does participate in an activity which results in injury, and which could reasonably have been foreseen by him as a possible result of the activity, the thing is not an accident under the definition of an accident under which this policy would be construed. (An accident means, gentlemen, something that is unforeseen, and is not an occurrence which might be reasonably anticipated from the activity in which the person is engaged.) . . *I charge you, gentlemen, if a person holding a policy insuring him against accidental injury does something which culpably provokes or induces the act causing his injury or death, then the result is not accidental, but if he is wholly free*

*from culpability himself, the result is accidental as to him, and of course in a case of that nature the plaintiff would be entitled to recover."*

The defendant objects to the above-quoted charge enclosed in parentheses, which states what an accident means, on the ground that it was misleading and confusing to the jury and erroneous, because it failed to give the correct rule of law applicable to said case. If the defendant had wished an elaboration of the charge, he should have presented a request in writing. The objection to the excerpt stated is not meritorious. The defendant also complains of the excerpt above quoted in italics. When the charge is considered in its entirety, it was not erroneous as being argumentative and confusing to the jury. The charge as a whole was not subject to the objection that it stressed and emphasized the plaintiff's contention, and failed to state the issues with equal emphasis, explicitness, or clearness as to the defendant's contention. The use of the words, "of course," in the last clause of the quoted charge, while inapt, was not an expression intimating what had been proved in the case, and the jury were not misled into believing that the court was expressing its opinion. The objection to this last excerpt is not meritorious.

7. Special ground 5 is not mentioned or argued in the brief of the defendant, and will be considered as abandoned.

8. The testimony referred to by the defendant in special ground 6 as having been illegally admitted over objection does not appear in the brief of evidence in the record; and where there is a variance between a special ground of a motion for new trial and the brief of evidence (the record), the brief of evidence prevails. *Watkins Co.* v. *Seawright,* 40 *Ga. App.* 314 (4) (149 S. E. 389); *Southern Railway Co.* v. *Flemister,* 120 *Ga.* 524 (48 S. E. 160). This ground is not meritorious.

9. After careful consideration of the 33 pages of evidence, we cannot say that the verdict was not authorized by the evidence. Accordingly, since the verdict of the jury has the approval of the trial judge and none of the special grounds shows reversible error, the judgment of the court below overruling the motion for new trial will not be disturbed.

There being a dissent in the division of this court to which this case was originally assigned, the case was considered and decided

648

by the court as a whole, pursuant to the act of the General Assembly, approved March 8, 1945 (Ga. L. 1945, p. 232).

*Judgment affirmed. Gardner and Parker, JJ., concur. Sutton, P. J., concurs in the judgment of affirmance.*

BROYLES, C. J., dissenting. I think that, under the facts of this case, special grounds 1, 2, 6, 8, 9 (a and c), 10, and 12 are meritorious and require another hearing of the case.

FELTON, J., dissenting. I dissent from the judgment because the charge as to the definition of an accident is in my opinion incorrect. I dissent also because I do not think that the evidence authorized the charge on positive and negative testimony. The testimony of the witness Spruell shows that he did not know how many times the car turned over, because when it first began to turn he became unconscious. An unconscious man hardly has an equal opportunity with positive witnesses to see an occurrence. It could hardly be said that the testimony of a man who said he did not see a thing happen because he was asleep was negative testimony. The jury would not have been authorized to find that the car did not turn over twice from the testimony of Spruell that he did not know how many times it turned over.